BASILE, S.p.A., Appellant,

v.

Francesco BASILE, Appellee.

No. 88–7228.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1989.

Decided March 20, 1990.

---

George M. Borababy, with whom Mary Elizabeth Bosco and V. Heather Sibbison, Washington, D.C., were on the brief, for appellant.

Gary D. Krugman, with whom Cynthia Clarke Weber, Washington, D.C., was on the brief, for appellee.

Before WILLIAMS and SENTELLE, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The two concerns before us dispute who may use the name "Basile" on wristwatches. To avert the confusion that would otherwise prevail among consumers, the district court limited the second comer's use of the mark. We find its limitations inadequate, and remand the case for proceedings consistent with our opinion.

## I

Appellant Basile S.p.A. is an Italian design house which has since 1972 sold high-quality fashion apparel, and since 1977 leather goods and accessories, in the United States under the trademark "Basile". It has registered the mark with the U.S. Patent and Trademark Office. Between 1980 and 1986, this Basile did approximately $30 million worth of retail business in the U.S., advertising its wares in such upscale publications as *Vogue, Harper's Bazaar,* and *Gentleman's Quarterly,* and selling them in stores to match—Bloomingdale's, Neiman Marcus, and Giorgio of Beverly Hills. Although Basile S.p.A. has not as yet sold any watches in this country, it has run a trial edition of nearly 300 for its European customers, and it states an intention to follow on the heels of other tony designers (Calvin Klein, Gucci, Yves St. Laurent, Hermes) that have already added watches to their fashion lines.

 Appellee Francesco Basile and his family have been making and selling watches in Italy since 1946, doing business

there as Diffusione Basile di Francesco & Co., S.A.S. (To avoid confusion on these pages, we will hereafter refer to Basile S.p.A. as "Basile" and to Francesco as "Francesco Basile" or just plain "Francesco.") With prices ranging from $1500 on up to $20,000, Francesco plainly also caters to the creamier end of the market. In the United States, he had sold fewer than twenty of his watches before this action commenced, all during 1986. For these sales he used a composite trademark consisting of "Basile" and a "double B" design (two Bs, the second one reversed so that the rounded sides of the two meet in the logo's center).[1] He also placed an ad in *Town & Country;* whether or not successful in stirring the interest of the gentry, it clearly aroused that of appellant. Basile promptly asked Francesco to stop using the mark in U.S. markets. See Joint Appendix ["J.A."] 36. The latter sought a declaratory judgment as to his rights to the name; the former countered with charges of unfair competition and trademark infringement in violation of its rights under common law and the Lanham Act, 15 U.S.C. § 1114 (1988), seeking to enjoin Francesco from all uses of it.

The district court found that before Francesco's entry into the market Basile had established for the name a "secondary" and hence protectable meaning in connection with watches. See Mem. Op., No. 86–3433, at 4 & n. 2, 1988 WL 93110 (D.D.C. Aug. 29, 1988). Applying the standard test for mark infringement under the Act, see *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492, 495 (2d Cir.1961), the court found that unrestricted use by Francesco would result in a likelihood of confusion between the two producers' goods and cause irreparable harm to Basile. Francesco does not contest these findings.

On the remedy, however, the district court's ruling fell well short of Basile's aim. The decision granted its request that Francesco be enjoined from using the name

as it had appeared in his initial American models. But the court did not bar Francesco from all uses of his surname. On the contrary, it accepted in full his proposed modifications to the original mark as sufficient to eliminate the prospect of confusion. These modifications included a changed typestyle, enlargement of the "double B" design to twice the size of the "Basile" name, addition of the geographic designator "Venezia" to the mark, and the inclusion on all advertisements, packaging materials, warranty cards, etc., of the following "disclaimer" (with no specification of typeface size):

> BASILE watches emanate exclusively from Diffusione Basile de Francesco Basile & Co., S.A.S. in Venice, Italy. Diffusione Basile is devoted solely to the manufacture and sale of fine watches throughout the world.

Mem. Op. 8–10. On appeal, Basile claims that the district court's order fails effectively to protect its trademark in the Basile name.

## II

"Once an individual's name has acquired a secondary meaning in the marketplace, a later competitor who seeks to use the same or similar name must take 'reasonable precautions to prevent the mistak[ing]' " of the two competitors' goods. *Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 734 (2nd Cir.1978), quoting *L.E. Waterman Co. v. Modern Pen Co.,* 235 U.S. 88, 94, 35 S.Ct. 91, 92, 59 L.Ed. 142 (1914). The sole question here is whether Francesco's modified use of the name will "prevent the mistake." We think not.

Common sense and experience make clear that under the district court's arrangement Francesco's watches will continue to be known as "Basile watches." As Learned Hand observed as district judge in the Waterman fountain pen case, consider-

---

**1.** Francesco had also registered his mark, but that is not legally significant in this context. Although Basile's registration is a predicate to its protection under the Lanham Act, the underlying right depends not on registration but rath-

er on use. See *Tillamook County Creamery Ass'n v. Tillamook Cheese and Dairy Ass'n,* 345 F.2d 158, 160 & n. 2 (9th Cir.1965); *Food Fair Stores v. Square Deal Market Co.,* 206 F.2d 482, 485–86 (D.C.Cir.1953).

ing a junior user's mark distinguished only by initials:

> Now it is perfectly plain to any candid person that the ordinary buyer pays little attention to such prefixes as "L.E." and "A.A." ... The public means by the "Waterman" pen the [senior user's] pen; indeed, so the defendant concedes, being punctilious to avoid that name without its prefix. But the public by that very fact looks no further than the name. For myself, although I have used such pens for years, I am sure that I should not have had the least suspicion but that an "A.A. Waterman" pen was a "Waterman" pen....

*L.E. Waterman Co. v. Modern Pen Co.*, 193 F. 242, 247–48 (S.D.N.Y.1912), *modified in part*, 197 F. 534 (2d Cir.) (per curiam), *aff'd* 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142 (1914). See also *Chickering v. Chickering & Sons*, 215 F. 490, 497–98 (7th Cir.1914).

The tendency to mislead would be even more decided on our facts. The spoken version of the marks will not differ even by prefix; the disclaimer itself even uses the protected name, and only that name. Neither the changed typestyle nor the enhanced "double B" symbol can change this fact; we think it unlikely that watch buyers will ask for a "double B watch" when the simple "Basile watch" is at hand. (We do not suppose many watch buyers to be more sophisticated than Judge Hand was with respect to his pens.) Watches are known and called by the words that appear on their faces: Rolex, Timex, Omega, Movado—we can think of no exception. Nor do we think this confusion avoided by the inclusion of "Venezia," especially as Basile is also Italian, and we doubt many American buyers place it firmly or exclusively in Milan. See *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 706 (2d Cir.1970) (addition of reference to Jena, junior user's city of origin, not enough to dispel confusion). Assuming the adopted modifications diminish confusion at all, Francesco surely has not met the "heavy burden ... to come forward with evidence sufficient to demonstrate that [the] proposed materials would significantly reduce the likelihood of consumer confusion." See *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1316 (2d Cir.1987).

Courts have rarely approved so mild a cure as that adopted by the district court here. They have routinely required second comers at a minimum to use full names, first as well as second in equal size. See, e.g., *Waterman*, 235 U.S. at 94, 35 S.Ct. at 92; *Berghoff Restaurant Co., Inc. v. Lewis W. Berghoff, Inc.*, 499 F.2d 1183 (7th Cir.1974); *Friend v. H.A. Friend & Co.*, 416 F.2d 526, 534 (9th Cir.1969); *Walter Baker & Co. v. Baker*, 87 F. 209 (C.C.S.D.N.Y.1898); *Emilio Pucci Societa v. Pucci Corp.*, 10 U.S.P.Q.2d 1541, 1545, 1988 WL 135542 (N.D.Ill.1988). The more recent trend is to forbid any use of the name as part of the proprietor's trademark, permitting use only in a subsidiary capacity, and again with the first name attached. See *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62 (2d Cir.1985) (junior user not permitted to include his name in company name); *Taylor Wine*, 569 F.2d at 736 (vineyard owner allowed to use name on wine bottles only in signature form); *Gucci v. Gucci Shops, Inc.*, 688 F.Supp. 916, 927 (S.D.N.Y.1988) ("American Tourister [trademark] by Paolo Gucci [non-trademark]" suggested as acceptable use); see also *Chickering*, 215 F. at 493 ("ACOUSTIGRANDE made by Chickering Brothers" allowed). In either event, the junior user has almost uniformly been bound to display negative disclaimers. See *Joseph Scott Co.*, 764 F.2d at 69 (disclaimer to be no less prominent than name); *Taylor Wine, supra, aff'd after remand*, 590 F.2d 701, 704 (same). Such was the result in *Waterman*, where the junior user was allowed to use his name only in conjunction with a negative disclaimer, in letters of the same size, *on the pen itself.* So much for Francesco's plea that forcing him to include the full name "Francesco Basile" on the watch would be an unreasonable or insupportable burden. See Brief of Appellee 12 ("[t]he name Francesco Basile simply does not fit onto a watch face").

Perhaps anticipating our conclusion that the district court's remedy will not "pre-

vent the mistake" between the two concerns, Francesco takes refuge in the precept that an individual has a "right" to do business under his own name. If some confusion persists under the challenged regime, he seems to say, that is an acceptable price for protecting the privilege.

A seller's right to use his family name might have carried the day against a risk of buyer confusion in an era when the role of personal and localized reputation gave the right a more exalted status. In *Burgess v. Burgess*, 3 De G.M. & G. 896, 903–04, 43 Eng.Rep. 351, 354 (1853), the plaintiff's son had followed him into the trade of making anchovy paste; Lord Justice Bruce said: "All the Queen's subjects have a right, if they will, to manufacture and sell pickles and sauces, and not the less that their fathers have done so before them. All the Queen's subjects have a right to sell these articles in their own names, and not the less so that they bear the same name as their fathers." See also *Brown Chemical Co. v. Meyer*, 139 U.S. 540, 544, 11 S.Ct. 625, 627, 35 L.Ed. 247 (1891) ("[a] man's name is his own property, and he has the same right to its use and enjoyment as he has to that of any other species of property"); *Stix, Baer & Fuller Dry Goods Co. v. American Piano Co.*, 211 F. 271, 274 (8th Cir.1913). But even quite old decisions have enjoined a second comer's use of his name where necessary to prevent confusion. See, e.g., *Thaddeus Davids Co. v. Davids Manufacturing Co.*, 233 U.S. 461, 472, 34 S.Ct. 648, 652, 58 L.Ed. 1046 (1914); *Hat Corp. of America v. D.L. Davis Corp.*, 4 F.Supp. 613, 623 (D.Conn.1933). The commentators, moreover, have been scornful of protecting the second comer's right to use his name at the expense of customer confusion, anathematizing it as the "sacred rights" theory. See Milton Handler & Charles Pickett, *Trade–Marks and Trade Names—An Analysis and Synthesis*, 30 Colum.L.Rev. 168, 197–200 (1930); Harry D. Nims, Unfair Competition and Trade-marks § 68 (4th ed. 1947); 3A Rudolf Callmann, Unfair Competition, Trademarks and Monopolies § 21.35 (4th ed. 1983); Case Note, 38 Harv.L.Rev. 405, 406 (1925).

True, even recent decisions have invoked the right to use one's name, at least as an interest against which the senior user's are balanced. See *Taylor Wine*, 569 F.2d at 735; *Friend*, 416 F.2d at 531; *Gucci*, 688 F.Supp. at 927. But its weight has decidedly diminished. The courts are now consistent in imposing tighter restrictions on the second comer in the face of possible confusion (essentially by upping the reasonableness threshold of *Waterman*); any residual protection of the second comer's use of his own name seems amply explained by the more general principle that an equitable remedy should be no broader than necessary to correct the wrong. See, e.g., *Soltex Polymer Corp. v. Fortex Indus. Inc.*, 4 U.S.P.Q.2d 1785, 1788 (2d Cir.1987) (citing *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971), for the principle). Where the second comer had established no reputation under his own name, one court did not even purport to "balance." *Bertolli, USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.*, 662 F.Supp. 203, 206–07 (S.D. N.Y.1987).

■ This trend in the law unsurprisingly reflects trends in the marketplace. In a world of primarily local trade, the goodwill of an anchovy paste seller may well have depended on his individual reputation within the community. Indeed, one elderly decision tells us that an entrepreneur's failure to use his family name once risked "the reproach of doing business under false colors." *Hat Corp.*, 4 F.Supp. at 623. By contrast, the court went on, "[i]n an age when by corporate activity, mass production, and national distribution, the truly personal element has been so largely squeezed out of business, there is naturally less legitimate pecuniary value in a family name." *Id.;* see also Handler & Pickett, 30 Colum.L.Rev. at 199. That was in 1933 and the point is more obvious today. Other than understandable pride and sense of identity, the modern businessman loses nothing by losing the name. A junior user's right to use his name thus must yield to the extent its exercise causes confusion with the senior user's mark. See *Max Factor & Co. v. Factor*, 226 F.Supp.

120, 128–29 (S.D.Cal.1963); *David B. Findlay v. Findlay*, 18 N.Y.2d 12, 271 N.Y.S.2d 652, 655–58, 218 N.E.2d 531, 534–35 (1966).

Here Francesco Basile's interest in the use of his name is peculiarly weak. He has no reputation in the United States as a watchmaker. Even in Europe he had until recently marketed his wares under the tradenames "BASMICH" and "BM," so we may infer that even his identity interests have been slight. (In fact we have been presented with the opinion of an Italian court which appears to prohibit Francesco from using his name *in Italy. Diffusione Basile di Francesco Basile & C. s.a.s. v. Basile S.p.A.*, Judgment No. 9877 (Civil Court of Milan Apr. 28, 1988) (unpublished opinion appended to Brief of Appellant).) There is no suggestion that the watch industry is one where an individual proprietor's personal presentation of his wares plays a key commercial role, as may still be true of high fashion designers such as Yves St. Laurent and Christian Dior. Nor is it a business that has remained largely local in scope. Although none of these conditions would allow a second comer to use his own name at a serious cost of customer confusion, their absence means that Francesco's interest in his own name here is scarcely greater than his interest in the name Bulova. While finding no error in the district court's refusal to draw conclusions with respect to Francesco's intentions, see Mem. Op. 6, we think the only plausible motivation for his fight here is a wish to free-ride on Basile's goodwill, precisely what the law means to suppress.

We decide this case with all due respect for the district court, aware that its discretion in drafting an injunction runs broad. But to say that we may reverse only for an abuse of that discretion does not mean that we may do so only where the district court's solution is fanciful or irrational. See *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1197 (2d Cir. 1971). Rather, the result here springs from our "strong conviction that [the district judge] exceeded the permissible bounds of judgment." *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 595 (7th Cir.1986). As we believe the ordered relief "render[ed] the Lanham Act protection meaningless," see *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 143 (3d Cir.1981), we must reverse. We recognize that in *N. Hess' Sons, Inc. v. Hess Apparel, Inc.*, 738 F.2d 1412 (4th Cir.1984) (per curiam), a sister circuit went far in acquiescing in a district court's rather feeble remedy, but on that aspect find Judge Rosenn's dissent more in line with the normal scope of review of injunctive relief. See *id.* at 1417.

\* \* \*

If Francesco can on remand come up with some use of his name on his watch that will be free of confusion, so be it. But he should in any case not find himself genuinely aggrieved by our decision. He remains free to bring his wares to America under a different label, and whatever goodwill he creates will be associated with the name he selects. *Bertolli*, 662 F.Supp. at 207. Meanwhile we protect the valid interests of a markholder and the integrity of the fine-watch market.